**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

United States Courts
Southern District of Texas
FILED
July 27, 2026
Nathan Ochsner, Clerk of Court

| | | |
|---|---|---|
| JERYCO KENT CHIZER,<br>Plaintiff,<br><br>v.<br><br>CITY OF GALVESTON, TEXAS,<br>GALVESTON COUNTY, TEXAS, et al.<br><br>Defendants. | ) | CIVIL ACTION NO. 3:25-cv-314 |

**PLAINTIFF'S SECOND AMENDED COMPLAINT**
**AND REQUEST FOR JURY TRIAL**

TO THE HONORABLE UNITED STATES DISTRICT COURT:

COMES NOW Plaintiff Jeryco Chizer by and through his undersigned counsel, complaining of Defendants, and respectfully alleges as follows:

## I. INTRODUCTION

1. This is a civil rights action brought pursuant to 42 U.S.C. § 1983 for violations of Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution.

2. Plaintiff was subjected to unlawful detention, unlawful arrest, and multiple instances of excessive force without justification. Plaintiff was beaten, tased repeatedly, and denied necessary medical care. Following this abuse, Plaintiff was released from custody with no valid charges, despite internal indications that material facts in the associated police reports were fabricated.

3. Plaintiff seeks actual and punitive damages, attorneys' fees, costs, and all other relief to which he is justly entitled.

## II. JURISDICTION AND VENUE

4. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 1343(a)(3), as this action arises under the Constitution and laws of the United States.

5. Venue is proper under 28 U.S.C. § 1391(b), as all events giving rise to the claims occurred in Galveston County, Texas.

## III. PARTIES

6. Plaintiff JERYCO CHIZER is an individual residing in the State of Texas. At all times relevant to the allegations of this complaint was a resident of Hardin County and a citizen of the United States.

7. Defendant CITY OF GALVESTON is and was at all relevant times a municipal corporation and may be served through its City Attorney or Mayor.

8. Defendant GALVESTON COUNTY is and was at all relevant times a governmental entity and may be served through the County Judge or County Attorney.

9. Defendant Andy J. "A.J." Kessler was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

10. Defendant Andrew Mejia was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the

agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

11. Defendant Gabriel Garza was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

12. Defendant Marc M. Healy (also known or referred to as "Mark" Healy) was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

13. Defendant Lee E. Prevost was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

14. Defendant Rylan J. Watkins/R. Watkins was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

15. Defendant Henry Trochesset was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the

agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

16. Defendant Jordan Buckley was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

17. Defendant Travis L. Hall was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

18. Defendant Ronald K. Paulk was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

19. Defendant Thomas Maffei was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

20. Defendant Mitchell Stephenson was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

21. Defendant Jeffrey Page was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

22. Defendant Kenneth Dunn was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

23. Defendant Paul Bohn was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

24. Defendant Pablo Cintron was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

25. Defendant Benjamin Moralez was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

26. Defendants JOHN DOES 1–10 are unknown individual officers and/or jail staff at all relevant times employed by the City of Galveston and/or Galveston County. These

individuals participated in or failed to intervene in the unlawful acts described herein. Their names and identities will be added once discovery reveals them. At all relevant times they were acting in such capacity as the agent, servant, and employee of defendant(s) City of Galveston and/or Galveston County. They are sued individually and in his official capacity.

## IV. FACTUAL ALLEGATIONS

27. On or about November 5, 2023, Plaintiff and his spouse were returning to their lawful temporary residence near the beach in Galveston, Texas. They had been escorted through a blocked off area hours after a nearby shooting by a uniformed law enforcement officer.

28. The escorting officer left abruptly, and Plaintiff was immediately confronted by other law enforcement officers who began shouting commands. Despite calmly explaining the situation and agreeing to commands to leave the area, Plaintiff was forcibly taken to the ground by multiple officers, beaten, and tased repeatedly.

29. Plaintiff was not resisting, not aggressive, and made no threatening movements. He was subsequently handcuffed, compliant, and yet continued to be subjected to repeated tasing and physical abuse.

30. Officers dragged Plaintiff to a law enforcement staging area, where—once out of public view—he was again violently assaulted without provocation. This resulted in serious injuries, including a torn tricep and related ligaments and tissues, fractured leg, torn diaphragm, and other trauma.

31. Plaintiff identifies deputies Garza, Mejia, Buckley, Healy, Stephenson, Paulk, and supervisors Hall and Maffie as the deputies taking these actions.

32. One of the said officers can be heard making complaints about how Plaintiff presented himself in his dress and physical appearance through jeers and insults. Although Plaintiff was respectful and compliant, the officers did not like Plaintiff's expressive conduct, including speech and dress.

33. Upon arrival at the Galveston County Jail, Plaintiff displayed objective signs of significant injury consistent with recent force and restraint, including visible swelling and bruising to his upper extremities, an inability to raise or use his arm normally, and complaints of numbness and loss of sensation in the arm/hand. Plaintiff also exhibited an abnormal gait and visible limping consistent with serious lower-extremity injury, and he repeatedly advised jail personnel that he was in severe pain, that he could not move his arm, and that he needed medical attention. These were not subtle or ambiguous symptoms; they were outwardly apparent manifestations of acute trauma that any reasonable person, especially an intake officer, would recognize as requiring prompt evaluation and, at minimum, meaningful assessment beyond routine vitals.

34. Despite Plaintiff's repeated complaints and obvious limitations, jail staff provided only a cursory screening limited to taking basic vital signs (e.g., blood pressure and temperature) and did not conduct any meaningful assessment of Plaintiff's injuries, did not document or respond to his loss-of-function complaints, and did not arrange timely medical evaluation, imaging, or transport.

35. Instead, Plaintiff was left in custody for hours without care while his pain and functional impairment persisted, and then released with no assistance other than a belated instruction to "go to the hospital." By disregarding repeated requests and obvious signs of serious injury and failing to obtain appropriate evaluation or treatment, jail personnel acted with deliberate indifference to Plaintiff's serious medical needs, and the Sheriff's Office's intake/medical practices were a moving force behind the resulting harm and exacerbation of injuries.

36. On information and belief, those present during Plaintiff's intake and denial of medical treatment were Defendants Kessler, Watkins, Prevost, Bohn, Moralez, Page, Citron. Each was aware of the seriousness of Plaintiff's injuries. As stated, none took any actions to get Plaintiff the treatment he required or even took steps to examine Plaintiff's injuries to dispel what simple observation showed were serious injuries.

37. After his release from the jail, Plaintiff went directly to the hospital where he required emergency surgery.

38. During this time, Defendant Dunn was assigned to oversee the units in the jail where Plaintiff was held. Defendant Dunn failed to exercise any oversight of Plaintiff in deliberate indifference to Plaintiff's condition.

39. Plaintiff was never charged with assaulting an officer or resisting arrest. Plaintiff was charged with the minor offense of public intoxication. After Plaintiff contested the case and requested a jury trial, the court dismissed the charge and noted the whole situation was strange and made no sense.

40. After requesting public records, Plaintiff discovered discrepancies between official reports and available video evidence. At least one report appears to have been authored by an individual who, according to information provided by department officials, may not have been present at the time of the events in question.

41. Additional records exhibit inconsistencies and signs of possible retroactive alterations or fabrication. The identities of all officers involved have not been fully disclosed, and at least one known officer (but what seems to be most officers) failed to activate or preserve video footage.

42. Upon information and belief, the law enforcement officers who participated in the events giving rise to this action were employees, agents, or contractors of the Galveston Police Department and/or the Galveston County Sheriff's Office, and were acting under color of law and pursuant to policies, customs, or directives issued by one or both entities. Discovery will clarify the chain of command, specific agency involvement, and jurisdictional authority during the events at issue.

43. On information and belief, the abuse to which plaintiff was subjected was consistent with an institutionalized practice of the Galveston Police Department and/or Galveston Sherriff's Office, which was known to and ratified by the City of Galveston and the County of Galveston, the defendants having at no time taken any effective action to prevent law enforcement personnel from continuing to engage in such misconduct.

44. Upon information and belief, well before the incident at issue, Galveston County policymakers—including the Sheriff, Captain Hall, and Incident Commander Maffei—were on notice of a pattern of materially similar misconduct by deputies assigned to

event-enforcement details and custodial operations, including over-aggressive citizen encounters, excessive force and Taser misuse, failure to activate/preserve recordings, and inaccurate or incomplete reporting used to justify force and arrests. This notice arose through multiple channels routinely available to and maintained by the Sheriff's Office and the County, including citizen complaints submitted through official complaint mechanisms, internal supervisory reviews and after-action processes for recurring City events, incident and arrest documentation, civil claims and litigation notices, and publicly available reports and postings concerning deputy conduct. Despite that notice, County policymakers failed to implement corrective training, supervision, discipline, screening, or deployment restrictions for deputies placed into high-risk event and jail roles, and instead continued to assign and empower the same force-forward approach without meaningful accountability safeguards—thereby ratifying and perpetuating an unconstitutional custom. The County's own handling of this incident—delayed/incomplete identification of involved deputies, missing or incomplete recordings, and a belated, cursory paper record used to justify force—further supports the reasonable inference that these were not isolated failures but the predictable product of a tolerated pattern and practice.

45. On information and belief, defendants the City of Galveston and/or the County of Galveston had prior notice of the vicious propensities of defendant law enforcement officers, but took no steps to train them, correct their abuse of authority, or to discourage their unlawful use of authority. The failure to properly train defendant law enforcement officers included the failure to instruct them in applicable provisions of the Texas State Penal Law and with proper and prudent use of force.

46. By allowing deputies to operate in the Event footprint and jail intake without enforced documentation, recording, and discipline, the City and County created an environment in which deputies could predictably use force and then justify it without consequence, directly causing the violations inflicted on Plaintiff.

47. As an additional reason to the above, and upon information and belief, Galveston County—through the Sheriff (Trochesset) as the final policymaker—either retained or delegated final authority for review and approval of use-of-force documentation and related offense reports arising from arrests and force incidents in general and especially at major public events and during jail intake. The Sheriff knew that accurate, timely, and substantive review of these reports is essential to preventing excessive force because such review governs training, discipline, deployment decisions, and whether unconstitutional force is corrected or instead normalized.

48. In this case, supervisory approval was claimed to be issued (including approval by Captain Hall) purporting to review and approve only a single deputy's use of force and the asserted basis for it, yet that "review" was perfunctory, relied on incomplete or missing recordings, and adopted false or reckless narratives used to justify the force and arrest. 1 The use of force report from deputy Garza is a simple form in which Garza fails to mention any other officers or other witnesses present (as is required) during his excessive use of force. Furthermore, the use of force review by Deputy Hall was perfunctory, literally ticking boxes, and explicitly ratified the use of force and stated it was within policy guidelines and followed

[1] Though the timing of the County's delivery of the report and the date of the report itself are suspicious indicating that the report was not part of the County's normal procedures, but done after the fact to paper over the institutional lack of oversight.

training and tactics. Therefore, Plaintiff's treatment is the official policy of the Galveston County Sherrif's Office.

49. By delegating review authority to subordinates without meaningful standards, audit, or consequence on the most important matters in law enforcement knowing the effects of such—or by acquiescing in rubber-stamp approvals that papered over misconduct—the Sheriff and County policymakers ratified the decision to use force and the unconstitutional basis offered to justify it, thereby establishing a County policy/custom that was a moving force behind the constitutional violations in this case.

50. Upon information and belief, the Sheriff's Office's systemic failures to require recording, preserve evidence, and conduct meaningful post-incident review—combined with the tolerance of inaccurate or conclusory reporting and rubber-stamp supervisory approvals—operate as an institutional "permission structure" for unconstitutional force. When deputies know that body-worn cameras may be off, key footage will not be retained, reports can be papered over after the fact, and supervisors will approve force without examining a complete record, the predictable and highly foreseeable result is that deputies use more force, more readily, and more unlawfully because the likelihood of consequences is effectively removed. In other words, the County's non-recording/non-preservation and perfunctory review practices are not merely after-the-fact procedural defects; they are a direct causal driver that encourages and normalizes excessive force and false justification. That system was a moving force behind the constitutional violations here because it enabled deputies to act aggressively in the Event footprint and during jail intake with the reasonable expectation that incomplete evidence, inaccurate narratives, and minimal oversight would shield them from accountability.

51. On information and belief, defendants the City of Galveston and/or the County of Galveston authorized, tolerated as institutionalized practices, and ratified the misconduct herein detailed by:

a.) Failing to properly discipline, restrict, and control employees, including defendant law enforcement officers, known to be irresponsible in their dealings with citizens of the community;

b.) Failing to take adequate precautions in the hiring, promotion, and retention of police personnel, including specifically defendant law enforcement officers;

c.) Failing to forward to the office of the District Attorney of Galveston County evidence of criminal acts committed by police personnel;

d.) Failing to establish and/or assure the functioning of a bona fide and meaningful departmental system for dealing with complaints of police misconduct, but instead responding to such complaints with bureaucratic power and official denials calculated to mislead the public. This conduct also constitutes gross negligence under state law.

52. As a consequence of the abuse of authority detailed above, plaintiff sustained the damages hereinbefore alleged.

53. Galveston County, acting through the Sheriff (Trochesset) as its final policymaker for law-enforcement and jail operations, maintained and enforced policies, customs, and practices that amounted to deliberate indifference to the constitutional rights of

citizens, and those policies/customs were the moving force behind the violations suffered by Plaintiff.

54. Upon information and belief, the County deployed and empowered deputies to police the Event and its surrounding “crime scene” footprint under an aggressive, force-forward enforcement posture, while failing to adopt and implement adequate training, supervision, and controls concerning (i) lawful citizen encounters and scene management (including interacting with non-suspect patrons lawfully present and seeking to leave), (ii) constitutional limits on use of force and Taser deployments (including use of force on compliant or subdued persons), (iii) detainee medical screening, access to care, and transport for injured arrestees, and (iv) required activation, retention, review, and audit of body-worn camera footage, Taser logs, reports, and complaint intake for use-of-force incidents. The need for training/supervision and meaningful reporting/video-retention safeguards in these high-risk areas was obvious, and the inadequacy was so likely to result in constitutional violations that County policymakers—including the Sheriff and supervisors such as Captain Hall and Incident Commander Maffei vested with final authority by the Sheriff—can reasonably be said to have been deliberately indifferent; despite notice of recurring aggression and unconstitutional force risks by deputies (including deputies known for violent or vicious propensities), the County nonetheless assigned, promoted, and authorized such deputies to work the Event and jail intake without effective oversight, discipline, or remedial training.

55. Further, after the incident, County policymakers had an opportunity to review the deputies’ actions and the basis for them and—through inaction, acquiescence, and ratification—approved or tolerated the conduct rather than imposing consequences or

correcting the operational plan, thereby permitting deputies to operate under an unwritten custom of "no accountability." As a direct and proximate result, Plaintiff was subjected to unreasonable seizure and excessive force at the Event and then deliberate indifference to his serious medical needs during booking and detention, all in violation of clearly established constitutional law.

56. Upon information and belief, Galveston County, acting through the Sheriff (Trochesset) as final policymaker and other policymakers, maintained and tolerated a policy, custom, and practice of minimizing, concealing, and avoiding accountability for unconstitutional uses of force by (a) failing to require deputies to activate body-worn cameras and to create complete use-of-force documentation, (b) permitting deputies and supervisors to treat video recording as optional in high-risk encounters, (c) failing to preserve and/or timely retrieve relevant recordings and data (including bodycam footage, jail intake/sally-port surveillance, and Taser logs/downloads), and (d) maintaining deficient complaint-intake and internal-review procedures that predictably result in missing evidence and "no consequences" outcomes.

57. This policy continues and can be seen even in litigation by Galveston County's general counsel's admissions that they only ever review documents—and do not even document cases such as Plaintiff's for claimed (albeit false) violations at issue or at such events or for claimed assaults or uses of force and do not maintain any body cam videos or official reports or dispatch logs to know who was on scene/call in such matters—which is absurd. County counsel even admitted they do not have a system of "inquisition" … or any other

verifiable method to find information—even to simply ask employees and law enforcement personnel basic questions.

58. This custom—whether by affirmative instruction, acquiescence, or deliberate non-enforcement—functioned as a de facto cover-up mechanism designed and intended to shield deputies and the County from scrutiny, discipline, and civil liability, and it was known to County policymakers (including the Sheriff) and approved through repeated tolerance and inaction. Such concealment and non-preservation practices reflect deliberate indifference because the need for strict recording, retention, and audit controls in use-of-force incidents is obvious, and the predictable consequence of allowing deputies to avoid filming and documentation is and results in further constitutional violations. In this case, consistent with that policy/custom, critical recordings and documentation of the encounter, transport, and detention were not captured, not preserved, and/or not produced, thereby enabling the underlying excessive-force and deliberate-indifference violations and impeding any meaningful contemporaneous review, correction, or discipline.

59. Upon information and belief, the City of Galveston, acting through its final policymakers and/or those vested with final decision-making authority over event operations and public safety, planned, authorized, and implemented the Event and the related public-safety/security operations within the Event footprint (including ingress/egress routes and adjacent "crime scene" areas) through a coordinated operational plan and agreement and unified command structure with other agencies, including Galveston County deputies that include defendants named herein, to provide crowd control and law-enforcement services.

60. In doing so, the City knowingly assumed and/or delegated operational authority for policing within the Event footprint to participating officers and deputies, yet failed to implement and enforce adequate supervision and accountability measures—such as mandatory body-worn camera activation, retention and audit of recordings and Taser data, standardized use-of-force reporting, complaint intake, and meaningful incident review—despite the obvious and foreseeable risk that aggressive enforcement in a dense nightlife/event setting would lead to unconstitutional seizures and excessive force against non-threatening, lawfully present patrons attempting to travel and leave the area.

61. The City's policies, customs, and practices of (a) approving the operational plan without constitutional safeguards, (b) acquiescing in a coordinated interagency approach that functionally operated as "police without accountability," and (c) failing to discipline, retrain, or correct known deficiencies, constituted deliberate indifference to constitutional rights and were a moving force behind the violations inflicted on Plaintiffs. Further, to the extent County personnel acted in the Event footprint pursuant to City-authorized event operations, those actions were taken under color of and in furtherance of the City's coordinated plan, making the City responsible for its own policy decisions and operational failures that caused the deprivation of Plaintiffs' rights.

62. While the precise form of the interagency arrangement is uniquely within Defendants' possession and will be confirmed in discovery, the City necessarily exercised authority through special-event permits, operations planning, staffing/over-time approvals, command presence, and/or direction of the geographic footprint and enforcement objectives. The City either assumed operational responsibility for policing in the Event footprint or

knowingly delegated substantial operational authority to County personnel while remaining responsible for the policy choices it made in structuring that plan, including the deliberate choice to implement a high-risk, force-forward enforcement posture in a dense nightlife/event setting without adequate constitutional safeguards for lawfully present patrons attempting to travel, exit, or reach lodging.

63. Further, upon information and belief, the City maintained and tolerated policies, customs, and practices that deprived citizens of constitutional protections and meaningful post-incident review by failing to require and enforce basic accountability measures during Event operations—such as mandatory activation of body-worn cameras, preservation of available recordings and communications, maintenance of dispatch/CAD logs and incident identifiers sufficient to identify all involved personnel, and timely creation and retention of complete incident and use-of-force documentation for serious arrests and force events occurring within the City-authorized Event footprint.

64. Consistent with these deficient City practices, the available recordings and documentation relating to Plaintiffs' encounter were incomplete and/or not preserved, and Plaintiff was denied timely access to basic identifying and incident information; this lack of recording, retention, and meaningful review was not accidental but the predictable product of policies and customs that make excessive force and unlawful detention more likely by allowing officers and deputies operating in the Event footprint to act without real oversight or consequence. These City policy decisions and operational failures constituted deliberate indifference and were a moving force behind the constitutional violations inflicted on Plaintiffs.

65. The City's own failure to require recording, retention, identification, and meaningful review for serious force incidents occurring within the City-authorized Event footprint mirrored and reinforced the County's non-accountability system, making unconstitutional force a highly predictable consequence of the City's event-operations choices. And the way these approvals and joint operations get done--the city had to know.

66. As detailed herein, after Plaintiff was transported to the Galveston County Jail—an institution operated by and under the Sheriff (Trochesset) as final policy maker and other policymaking authority of the Galveston County Sheriff—jail personnel from transport through main intake and holding acted with deliberate indifference to Plaintiff's serious medical needs and furthered a cover-up of the unconstitutional force used against him. Plaintiff arrived visibly injured and repeatedly advised jail staff that he was hurt and needed medical attention; nonetheless, intake and holding personnel refused to secure timely medical screening, evaluation, or transport, mocked and threatened Plaintiff, and left him in a holding cell for hours without care while his condition worsened. Jail staff also seized Plaintiff's property, prevented or unreasonably delayed his access to his phone, and thereby his wife while she was stranded, and then released him without assistance other than a belated admonition to "go to the hospital," creating an unreasonable risk of further harm and exacerbating his injuries.

67. Compounding this indifference, Defendant A.J. Kessler—who functioned as the principal intake officer on duty and authored the offense report—falsely or recklessly reported that he personally observed Plaintiff's purported intoxication, belligerence, and assaultive conduct and that such conduct justified the seizure and force, even though Kessler did not

witness the initial encounter and lacked a good-faith basis to claim personal observation of the alleged conduct; this false narrative was used to justify the arrest, support criminal charges, and insulate deputies and the County from accountability.

68. The Sheriff's Office and jail supervisors, such as Sergeant Dunn, knew, or should have known, that these practices—refusing care after obvious injury, denying access to outside help, and papering over force with inaccurate reports—created a highly predictable risk of constitutional violations, yet maintained, tolerated, and failed to correct these customs and practices, making them a moving force behind Plaintiff's unlawful detention, denial of medical care, and continued constitutional injury.

69. To further compound the foregoing, and upon information and belief, the Galveston County Sheriff (Trochesset as policy maker), County Sheriff's Office and County policymakers maintained and tolerated a system of avoidance and non-accountability designed to insulate deputies from scrutiny after uses of force—particularly at high-volume public events—by permitting incomplete or nonexistent body-worn camera recording, failing to require full and timely use-of-force documentation from all involved deputies, and allowing after-the-fact "papering" of incidents through cursory reports and perfunctory supervisory approvals such that no one, including the Sheriff, examines the basis for any force used or any of the circumstances in a use of force situation.

70. In this case, despite repeated public-records requests and multiple appeals, Plaintiff was denied timely access to basic identifying and incident information (including which deputies were involved and what force was used), and only later received additional reports and materials that had not been produced previously; even then, the documentation

produced was inconsistent, incomplete, and lacking critical detail. Although deputies believed to have been involved at initial stages of this incident /these incidents include Andrew Mejia, Gabriel Garza, Mark Healy, Jordan Buckley, Ronald K. Paulk, and Mitchell Stephenson, none produced complete contemporaneous bodycam footage, and the single video produced was incomplete and omitted critical portions of the initial encounter.

71. Likewise, only one deputy produced a use-of-force report, despite the County's own narrative admitting multiple uses of force by multiple deputies. That use of force report was cursory and failed to explain or justify the force with particularity, and any purported supervisory "review" (including approval attributed to Captain Hall) relied on and echoed the same false or reckless narrative advanced in Kessler's offense report—without meaningful review of video, without an evidentiary record, and without corrective action. This pattern of tolerated non-recording, non-preservation, delayed/incomplete production, and rubber-stamp review constitutes a County policy/custom of deliberate indifference that encourages excessive force and false reporting by making constitutional violations effectively consequence-free, and it was a moving force behind the violations inflicted on Plaintiff here.

## V. CAUSES OF ACTION

72. The allegations set forth above are incorporated herein by reference.

73. The hereinabove described actions and omissions, engaged in under color of state authority by the defendants, including defendants County and City, which are responsible because of their authorization, condonation, and ratification thereof for the acts of their agents, deprived the plaintiff of rights secured to him by the Constitution of the United States,

including, but not limited to, his first amendment right to freedom of expression, his fourth amendment right to be free from unlawful seizure of his person, fourteenth amendment rights to due process of law, including the right to be free from unjustified and excessive force utilized by police, and his fourteenth amendment right to medical care.

## VI. REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests

1. Actual damages in an amount to be proven at trial;
2. Punitive damages against individual Defendants;
3. Pre- and post-judgment interest as allowed by law;
4. Attorneys' fees and costs under 42 U.S.C. § 1988;
5. Such other relief as the Court deems just and proper.

## VII. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

ATTORNEYS FOR PLAINTIFF

Watson Legal PC

By: /s/: Benton Ross Watson
Benton Watson
Attorney-in-Charge, Texas Bar No. 24077591
S.D. Texas No. 279128
Email: benton@watson.legal
4105 Clay Street, Unit #2
Houston, TX 77023
Tel. (254) 455-0569

Law Office of Jonathan Vernon, PLLC
By: /s/: Jonathan Vernon
Jonathan Vernon
Attorney-in-Charge Texas Bar No. 24075219
Southern District of Texas Bar No. 3923151 Email: jonathan@jvernonlaw.com
681 Park Street
Beaumont, TX 77701
Tel. (409) 727-4847
Fax. (409) 727-4867
Attorneys for Plaintiff Jeryco Kent Chizer

## CERTIFICATE OF SERVICE ON PARTIES

I certify that a true and correct copy of Plaintiff's Second Amended Complaint (also attached as Exhibit A to motion for leave to amend) was sent via the Pacer system to the attorneys of record for all the parties in this action.

Dated: 7/24/26

/s/: Benton Ross Watson
Benton Watson
Attorney for Plaintiff
Jeryco Kent Chizer

**Exhibit A-1**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| JERYCO KENT CHIZER, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 3:25-cv-314 |
| | ) | |
| CITY OF GALVESTON, TEXAS, | ) | |
| GALVESTON COUNTY, TEXAS, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| ~~CITY OF GALVESTON, TEXAS,~~ | ) | |
| ~~GALVESTON COUNTY, TEXAS,~~ | ) | |
| | ) | |
| ~~Andy J. "A.J." Kessler (individually and in his official capacities),~~ | ) | |
| | ) | |
| ~~Andrew Mejia (individually and in his official capacities),~~ | ) | |
| | ) | |
| ~~Gabriel Garza (individually and in his official capacities),~~ | ) | |
| | ) | |
| ~~Marc M. Healy (individually and in his official capacities),~~ | ) | |
| | ) | |
| ~~Lee E. Prevost (individually and in his official capacities),~~ | ) | |
| | ) | |
| ~~Rylan J. Watkins/R. (individually and in his official capacities),~~ | ) | |
| | ) | |
| ~~Henry Trochesset (individually and in his official capacities),~~ | ) | |

Jordan Buckley. (individually and in his official capacities),

Travis L. Hall (individually and in his official capacities),

Ronald K. Paulk (individually and in his official capacities),

Thomas Maffei (individually and in his official capacities),

Mitchell Stephenson (individually and in his official capacities),

Jeffrey Page (individually and in his official capacities),

Audreya Tidwell (individually and in her official capacities),

Tammy Padron (individually and in her official capacities),

Kenneth Dunn (individually and in his official capacities),

Paul Bohn (individually and in his official capacities),

Pablo Cintron (individually and in his official capacities),

Benjamin Moralez (individually and in his official capacities),

April Rodriguez (individually and in

~~her official capacities),~~ )
)
~~JOHN DOES 1–10 (individually and in~~ )
~~their official capacities),~~ )
)
~~Defendants.~~ )
)

**PLAINTIFF'S ~~FIRST~~ SECOND AMENDED COMPLAINT AND REQUEST FOR JURY TRIAL**

TO THE HONORABLE UNITED STATES DISTRICT COURT:

COMES NOW Plaintiff Jeryco Chizer by and through his undersigned counsel, complaining of Defendants, and respectfully alleges as follows:

## I. INTRODUCTION

1. This is a civil rights action brought pursuant to 42 U.S.C. § 1983 for violations of Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution.

2. Plaintiff was subjected to unlawful detention, unlawful arrest, and multiple instances of excessive force without justification. Plaintiff was beaten, tased repeatedly, and denied necessary medical care. Following this abuse, Plaintiff was released from custody with no valid charges, despite internal indications that material facts in the associated police reports were fabricated.

3. Plaintiff seeks actual and punitive damages, attorneys' fees, costs, and all other relief to which he is justly entitled.

## II. JURISDICTION AND VENUE

4. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 1343(a)(3), as

this action arises under the Constitution and laws of the United States.

5. Venue is proper under 28 U.S.C. § 1391(b), as all events giving rise to the claims occurred in Galveston County, Texas.

III. PARTIES

6. Plaintiff JERYCO CHIZER is an individual residing in the State of Texas. At all times relevant to the allegations of this complaint was a resident of Hardin County and a citizen of the United States.

7. Defendant CITY OF GALVESTON is and was at all relevant times a municipal corporation and may be served through its City Attorney or Mayor.

8. Defendant GALVESTON COUNTY is and was at all relevant times a governmental entity and may be served through the County Judge or County Attorney.

9. Defendant Andy J. "A.J." Kessler was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

10. Defendant Andrew Mejia was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

11. Defendant Gabriel Garza was at all relevant times employed by Galveston

County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

12. Defendant Marc M. Healy (also known or referred to as "Mark" Healy) was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

13. Defendant Lee E. Prevost was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

14. Defendant Rylan J. Watkins/R. Watkins was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

15. Defendant Henry Trochesset was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

16. Defendant Jordan Buckley was at all relevant times employed by Galveston

County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

17. Defendant Travis L. Hall was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

18. Defendant Ronald K. Paulk was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

19. Defendant Thomas Maffei was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

20. Defendant Mitchell Stephenson was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

21. Defendant Jeffrey Page was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the

agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

~~22. Defendant Audreya Tidwell was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times she was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. She is sued individually and in her official capacity.~~

~~23. Defendant Tammy Padron was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times she was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. She is sued individually and in her official capacity.~~

~~24.~~22. Defendant Kenneth Dunn was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

~~25.~~23. Defendant Paul Bohn was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

~~26.~~24. Defendant Pablo Cintron was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston.

He is sued individually and in his official capacity.

~~27.~~25. Defendant Benjamin Moralez was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

~~28. Defendant April Rodriguez was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times she was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. She is sued individually and in her official capacity.~~

~~29.~~26. Defendants JOHN DOES 1–10 are unknown individual officers and/or jail staff at all relevant times employed by the City of Galveston and/or Galveston County. These individuals participated in or failed to intervene in the unlawful acts described herein. Their names and identities will be added once discovery reveals them. At all relevant times they were acting in such capacity as the agent, servant, and employee of defendant(s) City of Galveston and/or Galveston County. They are sued individually and in his official capacity.

## IV. FACTUAL ALLEGATIONS

~~30.~~27. On or about November 5, 2023, Plaintiff and his spouse were returning to their lawful temporary residence near the beach in Galveston, Texas. They had been escorted through a restricted area by a uniformed law enforcement officer after a nearby shooting.

~~31.~~28. The escorting officer left abruptly, and Plaintiff was immediately confronted by other law enforcement officers who began shouting commands. Despite calmly explaining the situation, Plaintiff was forcibly taken to the ground by multiple officers and tased repeatedly.

~~32.~~29. Plaintiff was not resisting, not aggressive, and made no threatening movements. He was subsequently handcuffed, compliant, and yet continued to be subjected to repeated tasing and physical abuse.

~~33.~~30. Officers dragged Plaintiff to a law enforcement staging area, where—once out of public view—he was again violently assaulted without provocation. This resulted in serious injuries, including a torn tricep and related ligaments and tissues, fractured leg, torn diaphragm, and other trauma.

31. Plaintiff identifies deputies Garza, Mejia, Buckley, Healy, Stephenson, Paulk, and supervisors Hall and Maffie as the deputies taking these actions.

32. One of the said officers can be heard making complaints about how Plaintiff presented himself in his dress and physical appearance through jeers and insults. Although Plaintiff was respectful and compliant, the officers did not like Plaintiff's expressive conduct, including speech and dress.

33. Upon arrival at the Galveston County Jail, Plaintiff displayed objective signs of significant injury consistent with recent force and restraint, including visible swelling and bruising to his upper extremities, an inability to raise or use his arm normally, and complaints of numbness and loss of sensation in the arm/hand. Plaintiff also exhibited an abnormal gait

and visible limping consistent with serious lower-extremity injury, and he repeatedly advised jail personnel that he was in severe pain, that he could not move his arm, and that he needed medical attention. These were not subtle or ambiguous symptoms; they were outwardly apparent manifestations of acute trauma that any reasonable person, especially an intake officer, would recognize as requiring prompt evaluation and, at minimum, meaningful assessment beyond routine vitals.

34. Despite Plaintiff's repeated complaints and obvious limitations, jail staff provided only a cursory screening limited to taking basic vital signs (e.g., blood pressure and temperature) and did not conduct any meaningful assessment of Plaintiff's injuries, did not document or respond to his loss-of-function complaints, and did not arrange timely medical evaluation, imaging, or transport.

35. Instead, Plaintiff was left in custody for hours without care while his pain and functional impairment persisted, and then released with no assistance other than a belated instruction to "go to the hospital." By disregarding repeated requests and obvious signs of serious injury and failing to obtain appropriate evaluation or treatment, jail personnel acted with deliberate indifference to Plaintiff's serious medical needs, and the Sheriff's Office's intake/medical practices were a moving force behind the resulting harm and exacerbation of injuries.

36. On information and belief, those present during Plaintiff's intake and denial of medical treatment were Defendants Kessler, Watkins, Prevost, Bohn, Moralez, Page, Citron. Each was aware of the seriousness of Plaintiff's injuries. As stated, none took any actions to

get Plaintiff the treatment he required or even took steps to examine Plaintiff's injuries to dispel what simple observation showed were serious injuries.

37. After his release from the jail, Plaintiff went directly to the hospital where he required emergency surgery.

38. During this time, Defendant Dunn was assigned to oversee the units in the jail where Plaintiff was held. Defendant Dunn failed to exercise any oversight of Plaintiff in deliberate indifference to Plaintiff's condition.

39. Plaintiff was never charged with assaulting an officer or resisting arrest. Plaintiff was charged with the minor offense of public intoxication. After Plaintiff contested the case and requested a jury trial, the court dismissed the charge and noted the whole situation was strange and made no sense.

40. After requesting public records, Plaintiff discovered discrepancies between official reports and available video evidence. At least one report appears to have been authored by an individual who, according to information provided by department officials, may not have been present at the time of the events in question.

41. Additional records exhibit inconsistencies and signs of possible retroactive alterations or fabrication. The identities of all officers involved have not been fully disclosed, and at least one known officer (but what seems to be most officers) failed to activate or preserve video footage.

42. Upon information and belief, the law enforcement officers who participated in the events giving rise to this action were employees, agents, or contractors of the Galveston Police Department and/or the Galveston County Sheriff's Office, and were acting under color

of law and pursuant to policies, customs, or directives issued by one or both entities. Discovery will clarify the chain of command, specific agency involvement, and jurisdictional authority during the events at issue.

43. On information and belief, the abuse to which plaintiff was subjected was consistent with an institutionalized practice of the Galveston Police Department and/or Galveston Sherriff's Office, which was known to and ratified by the City of Galveston and the County of Galveston, the defendants having at no time taken any effective action to prevent law enforcement personnel from continuing to engage in such misconduct.

44. Upon information and belief, well before the incident at issue, Galveston County policymakers—including the Sheriff, Captain Hall, and Incident Commander Maffei—were on notice of a pattern of materially similar misconduct by deputies assigned to event-enforcement details and custodial operations, including over-aggressive citizen encounters, excessive force and Taser misuse, failure to activate/preserve recordings, and inaccurate or incomplete reporting used to justify force and arrests. This notice arose through multiple channels routinely available to and maintained by the Sheriff's Office and the County, including citizen complaints submitted through official complaint mechanisms, internal supervisory reviews and after-action processes for recurring City events, incident and arrest documentation, civil claims and litigation notices, and publicly available reports and postings concerning deputy conduct. Despite that notice, County policymakers failed to implement corrective training, supervision, discipline, screening, or deployment restrictions for deputies placed into high-risk event and jail roles, and instead continued to assign and empower the same force-forward approach without meaningful accountability safeguards—thereby ratifying

and perpetuating an unconstitutional custom. The County's own handling of this incident—delayed/incomplete identification of involved deputies, missing or incomplete recordings, and a belated, cursory paper record used to justify force—further supports the reasonable inference that these were not isolated failures but the predictable product of a tolerated pattern and practice.

45. On information and belief, defendants the City of Galveston and/or the County of Galveston had prior notice of the vicious propensities of defendant law enforcement officers, but took no steps to train them, correct their abuse of authority, or to discourage their unlawful use of authority. The failure to properly train defendant law enforcement officers included the failure to instruct them in applicable provisions of the Texas State Penal Law and with proper and prudent use of force.

46. By allowing deputies to operate in the Event footprint and jail intake without enforced documentation, recording, and discipline, the City and County created an environment in which deputies could predictably use force and then justify it without consequence, directly causing the violations inflicted on Plaintiff.

47. As an additional reason to the above, and upon information and belief, Galveston County—through the Sheriff (Trochesset) as the final policymaker—either retained or delegated final authority for review and approval of use-of-force documentation and related offense reports arising from arrests and force incidents in general and especially at major public events and during jail intake. The Sheriff knew that accurate, timely, and substantive review of these reports is essential to preventing excessive force because such review governs

training, discipline, deployment decisions, and whether unconstitutional force is corrected or instead normalized.

48. In this case, supervisory approval was claimed to be issued (including approval by Captain Hall) purporting to review and approve only a single deputy's use of force and the asserted basis for it, yet that "review" was perfunctory, relied on incomplete or missing recordings, and adopted false or reckless narratives used to justify the force and arrest. 1 The use of force report from deputy Garza is a simple form in which Garza fails to mention any other officers or other witnesses present (as is required) during his excessive use of force. Furthermore, the use of force review by Deputy Hall was perfunctory, literally ticking boxes, and explicitly ratified the use of force and stated it was within policy guidelines and followed training and tactics. Therefore, Plaintiff's treatment is the official policy of the Galveston County Sherrif's Office.

49. By delegating review authority to subordinates without meaningful standards, audit, or consequence on the most important matters in law enforcement knowing the effects of such—or by acquiescing in rubber-stamp approvals that papered over misconduct—the Sheriff and County policymakers ratified the decision to use force and the unconstitutional basis offered to justify it, thereby establishing a County policy/custom that was a moving force behind the constitutional violations in this case.

50. Upon information and belief, the Sheriff's Office's systemic failures to require recording, preserve evidence, and conduct meaningful post-incident review—combined with

[1] Though the timing of the County's delivery of the report and the date of the report itself are suspicious indicating that the report was not part of the County's normal procedures, but done after the fact to paper over the institutional lack of oversight.

the tolerance of inaccurate or conclusory reporting and rubber-stamp supervisory approvals—operate as an institutional "permission structure" for unconstitutional force. When deputies know that body-worn cameras may be off, key footage will not be retained, reports can be papered over after the fact, and supervisors will approve force without examining a complete record, the predictable and highly foreseeable result is that deputies use more force, more readily, and more unlawfully because the likelihood of consequences is effectively removed. In other words, the County's non-recording/non-preservation and perfunctory review practices are not merely after-the-fact procedural defects; they are a direct causal driver that encourages and normalizes excessive force and false justification. That system was a moving force behind the constitutional violations here because it enabled deputies to act aggressively in the Event footprint and during jail intake with the reasonable expectation that incomplete evidence, inaccurate narratives, and minimal oversight would shield them from accountability.

~~34. During his detention at the jail, Plaintiff received no medical attention. He was ultimately released some time after arrival, and told to find his own way to the hospital, where he required emergency surgery.~~

~~35. After requesting public records, Plaintiff discovered discrepancies between official reports and available video evidence. At least one report appears to have been authored by an individual who, according to information provided by department officials, may not have been present at the time of the events in question.~~

~~36. Additional records exhibit inconsistencies and signs of possible retroactive alterations or fabrication. The identities of all officers involved have not been fully disclosed,~~

~~and at least one known officer (but what seems to be most officers) failed to activate or preserve video footage.~~

~~37. Upon information and belief, the law enforcement officers who participated in the events giving rise to this action were employees, agents, or contractors of the Galveston Police Department and/or the Galveston County Sheriff's Office, and were acting under color of law and pursuant to policies, customs, or directives issued by one or both entities. Discovery will clarify the chain of command, specific agency involvement, and jurisdictional authority during the events at issue.~~

~~38. On information and belief, the abuse to which plaintiff was subjected was consistent with an institutionalized practice of the Galveston Police Department and/or Galveston Sherriff's Office, which was known to and ratified by the City of Galveston and the County of Galveston, the defendants having at no time taken any effective action to prevent law enforcement personnel from continuing to engage in such misconduct.~~

~~39. On information and belief, defendants the City of Galveston and/or the County of Galveston had prior notice of the vicious propensities of defendant law enforcement officers, but took no steps to train them, correct their abuse of authority, or to discourage their unlawful use of authority. The failure to properly train defendant law enforcement officers included the failure to instruct them in applicable provisions of the Texas State Penal Law and with proper and prudent use of force.~~

~~40.~~51. On information and belief, defendants the City of Galveston and/or the County of Galveston authorized, tolerated as institutionalized practices, and ratified the

misconduct hereinbefore detailed by:

a. Failing to properly discipline, restrict, and control employees, including defendant law enforcement officers, known to be irresponsible in their dealings with citizens of the community;

b. Failing to take adequate precautions in the hiring, promotion, and retention of police personnel, including specifically defendant law enforcement officers;

c. Failing to forward to the office of the District Attorney of Galveston County evidence of criminal acts committed by police personnel;

d. Failing to establish and/or assure the functioning of a *bona fide* and meaningful departmental system for dealing with complaints of police misconduct, but instead responding to such complaints with bureaucratic power and official denials calculated to mislead the public. This conduct also constitutes gross negligence under state law.

41.52. As a consequence of the abuse of authority detailed above, plaintiff sustained the damages hereinbefore alleged.

53. Galveston County, acting through the Sheriff (Trochesset) as its final policymaker for law-enforcement and jail operations, maintained and enforced policies, customs, and practices that amounted to deliberate indifference to the constitutional rights of citizens, and those policies/customs were the moving force behind the violations suffered by Plaintiff.

54. Upon information and belief, the County deployed and empowered deputies to police the Event and its surrounding "crime scene" footprint under an aggressive, force-forward

enforcement posture, while failing to adopt and implement adequate training, supervision, and controls concerning (i) lawful citizen encounters and scene management (including interacting with non-suspect patrons lawfully present and seeking to leave), (ii) constitutional limits on use of force and Taser deployments (including use of force on compliant or subdued persons), (iii) detainee medical screening, access to care, and transport for injured arrestees, and (iv) required activation, retention, review, and audit of body-worn camera footage, Taser logs, reports, and complaint intake for use-of-force incidents. The need for training/supervision and meaningful reporting/video-retention safeguards in these high-risk areas was obvious, and the inadequacy was so likely to result in constitutional violations that County policymakers—including the Sheriff and supervisors such as Captain Hall and Incident Commander Maffei vested with final authority by the Sheriff—can reasonably be said to have been deliberately indifferent; despite notice of recurring aggression and unconstitutional force risks by deputies (including deputies known for violent or vicious propensities), the County nonetheless assigned, promoted, and authorized such deputies to work the Event and jail intake without effective oversight, discipline, or remedial training.

55. Further, after the incident, County policymakers had an opportunity to review the deputies' actions and the basis for them and—through inaction, acquiescence, and ratification—approved or tolerated the conduct rather than imposing consequences or correcting the operational plan, thereby permitting deputies to operate under an unwritten custom of "no accountability." As a direct and proximate result, Plaintiff was subjected to unreasonable seizure

and excessive force at the Event and then deliberate indifference to his serious medical needs during booking and detention, all in violation of clearly established constitutional law.

56. Upon information and belief, Galveston County, acting through the Sheriff (Trochesset) as final policymaker and other policymakers, maintained and tolerated a policy, custom, and practice of minimizing, concealing, and avoiding accountability for unconstitutional uses of force by (a) failing to require deputies to activate body-worn cameras and to create complete use-of-force documentation, (b) permitting deputies and supervisors to treat video recording as optional in high-risk encounters, (c) failing to preserve and/or timely retrieve relevant recordings and data (including bodycam footage, jail intake/sally-port surveillance, and Taser logs/downloads), and (d) maintaining deficient complaint-intake and internal-review procedures that predictably result in missing evidence and "no consequences" outcomes.

57. This policy continues and can be seen even in litigation by Galveston County's general counsel's admissions that they only ever review documents—and do not even document cases such as Plaintiff's for claimed (albeit false) violations at issue or at such events or for claimed assaults or uses of force and do not maintain any body cam videos or official reports or dispatch logs to know who was on scene/call in such matters—which is absurd. County counsel even admitted they do not have a system of "inquisition" … or any other verifiable method to find information—even to simply ask employees and law enforcement personnel basic questions.

58. This custom—whether by affirmative instruction, acquiescence, or deliberate non-enforcement—functioned as a de facto cover-up mechanism designed and intended to

shield deputies and the County from scrutiny, discipline, and civil liability, and it was known to County policymakers (including the Sheriff) and approved through repeated tolerance and inaction. Such concealment and non-preservation practices reflect deliberate indifference because the need for strict recording, retention, and audit controls in use-of-force incidents is obvious, and the predictable consequence of allowing deputies to avoid filming and documentation is and results in further constitutional violations. In this case, consistent with that policy/custom, critical recordings and documentation of the encounter, transport, and detention were not captured, not preserved, and/or not produced, thereby enabling the underlying excessive-force and deliberate-indifference violations and impeding any meaningful contemporaneous review, correction, or discipline.

59. Upon information and belief, the City of Galveston, acting through its final policymakers and/or those vested with final decision-making authority over event operations and public safety, planned, authorized, and implemented the Event and the related public-safety/security operations within the Event footprint (including ingress/egress routes and adjacent "crime scene" areas) through a coordinated operational plan and agreement and unified command structure with other agencies, including Galveston County deputies that include defendants named herein, to provide crowd control and law-enforcement services.

60. In doing so, the City knowingly assumed and/or delegated operational authority for policing within the Event footprint to participating officers and deputies, yet failed to implement and enforce adequate supervision and accountability measures—such as mandatory body-worn camera activation, retention and audit of recordings and Taser data, standardized use-

of-force reporting, complaint intake, and meaningful incident review—despite the obvious and foreseeable risk that aggressive enforcement in a dense nightlife/event setting would lead to unconstitutional seizures and excessive force against non-threatening, lawfully present patrons attempting to travel and leave the area.

61. The City's policies, customs, and practices of (a) approving the operational plan without constitutional safeguards, (b) acquiescing in a coordinated interagency approach that functionally operated as "police without accountability," and (c) failing to discipline, retrain, or correct known deficiencies, constituted deliberate indifference to constitutional rights and were a moving force behind the violations inflicted on Plaintiffs. Further, to the extent County personnel acted in the Event footprint pursuant to City-authorized event operations, those actions were taken under color of and in furtherance of the City's coordinated plan, making the City responsible for its own policy decisions and operational failures that caused the deprivation of Plaintiffs' rights.

62. While the precise form of the interagency arrangement is uniquely within Defendants' possession and will be confirmed in discovery, the City necessarily exercised authority through special-event permits, operations planning, staffing/over-time approvals, command presence, and/or direction of the geographic footprint and enforcement objectives. The City either assumed operational responsibility for policing in the Event footprint or knowingly delegated substantial operational authority to County personnel while remaining responsible for the policy choices it made in structuring that plan, including the deliberate choice to implement a high-risk, force-forward enforcement posture in a dense nightlife/event setting

without adequate constitutional safeguards for lawfully present patrons attempting to travel, exit, or reach lodging.

63. Further, upon information and belief, the City maintained and tolerated policies, customs, and practices that deprived citizens of constitutional protections and meaningful post-incident review by failing to require and enforce basic accountability measures during Event operations—such as mandatory activation of body-worn cameras, preservation of available recordings and communications, maintenance of dispatch/CAD logs and incident identifiers sufficient to identify all involved personnel, and timely creation and retention of complete incident and use-of-force documentation for serious arrests and force events occurring within the City-authorized Event footprint.

64. Consistent with these deficient City practices, the available recordings and documentation relating to Plaintiffs' encounter were incomplete and/or not preserved, and Plaintiff was denied timely access to basic identifying and incident information; this lack of recording, retention, and meaningful review was not accidental but the predictable product of policies and customs that make excessive force and unlawful detention more likely by allowing officers and deputies operating in the Event footprint to act without real oversight or consequence. These City policy decisions and operational failures constituted deliberate indifference and were a moving force behind the constitutional violations inflicted on Plaintiffs.

65. The City's own failure to require recording, retention, identification, and meaningful review for serious force incidents occurring within the City-authorized Event footprint mirrored and reinforced the County's non-accountability system, making

unconstitutional force a highly predictable consequence of the City's event-operations choices. And the way these approvals and joint operations get done--the city had to know.

66. As detailed herein, after Plaintiff was transported to the Galveston County Jail—an institution operated by and under the Sheriff (Trochesset) as final policy maker and other policymaking authority of the Galveston County Sheriff—jail personnel from transport through main intake and holding acted with deliberate indifference to Plaintiff's serious medical needs and furthered a cover-up of the unconstitutional force used against him. Plaintiff arrived visibly injured and repeatedly advised jail staff that he was hurt and needed medical attention; nonetheless, intake and holding personnel refused to secure timely medical screening, evaluation, or transport, mocked and threatened Plaintiff, and left him in a holding cell for hours without care while his condition worsened. Jail staff also seized Plaintiff's property, prevented or unreasonably delayed his access to his phone, and thereby his wife while she was stranded, and then released him without assistance other than a belated admonition to "go to the hospital," creating an unreasonable risk of further harm and exacerbating his injuries.

67. Compounding this indifference, Defendant A.J. Kessler—who functioned as the principal intake officer on duty and authored the offense report—falsely or recklessly reported that he personally observed Plaintiff's purported intoxication, belligerence, and assaultive conduct and that such conduct justified the seizure and force, even though Kessler did not witness the initial encounter and lacked a good-faith basis to claim personal observation of the alleged conduct; this false narrative was used to justify the arrest, support criminal charges, and insulate deputies and the County from accountability.

68. The Sheriff's Office and jail supervisors, such as Sergeant Dunn, knew, or should have known, that these practices—refusing care after obvious injury, denying access to outside help, and papering over force with inaccurate reports—created a highly predictable risk of constitutional violations, yet maintained, tolerated, and failed to correct these customs and practices, making them a moving force behind Plaintiff's unlawful detention, denial of medical care, and continued constitutional injury.

69. To further compound the foregoing, and upon information and belief, the Galveston County Sheriff (Trochesset as policy maker), County Sheriff's Office and County policymakers maintained and tolerated a system of avoidance and non-accountability designed to insulate deputies from scrutiny after uses of force—particularly at high-volume public events—by permitting incomplete or nonexistent body-worn camera recording, failing to require full and timely use-of-force documentation from all involved deputies, and allowing after-the-fact "papering" of incidents through cursory reports and perfunctory supervisory approvals such that no one, including the Sheriff, examines the basis for any force used or any of the circumstances in a use of force situation.

70. In this case, despite repeated public-records requests and multiple appeals, Plaintiff was denied timely access to basic identifying and incident information (including which deputies were involved and what force was used), and only later received additional reports and materials that had not been produced previously; even then, the documentation produced was inconsistent, incomplete, and lacking critical detail. Although deputies believed to have been involved at initial stages of this incident /these incidents include Andrew Mejia, Gabriel Garza,

Mark Healy, Jordan Buckley, Ronald K. Paulk, and Mitchell Stephenson, none produced complete contemporaneous bodycam footage, and the single video produced was incomplete and omitted critical portions of the initial encounter.

71. Likewise, only one deputy produced a use-of-force report, despite the County's own narrative admitting multiple uses of force by multiple deputies. That use of force report was cursory and failed to explain or justify the force with particularity, and any purported supervisory "review" (including approval attributed to Captain Hall) relied on and echoed the same false or reckless narrative advanced in Kessler's offense report—without meaningful review of video, without an evidentiary record, and without corrective action. This pattern of tolerated non-recording, non-preservation, delayed/incomplete production, and rubber-stamp review constitutes a County policy/custom of deliberate indifference that encourages excessive force and false reporting by making constitutional violations effectively consequence-free, and it was a moving force behind the violations inflicted on Plaintiff here.

## V. CAUSES OF ACTION

~~42.~~72. The allegations set forth above are incorporated herein by reference.

~~43.~~73. The hereinabove described actions and omissions, engaged in under color of state authority by the defendants, including defendants County and City, which are responsible because of their authorization, condonation, and ratification thereof for the acts of their agents, deprived the plaintiff of rights secured to him by the Constitution of the United States, including, but not limited to, his first amendment right to freedom of expression, his fourth amendment right to be free from unlawful seizure of his person, his

fifth and fourteenth amendment rights to due process of law, including the right to be free from unjustified and excessive force utilized by police, his fourteenth amendment right to medical care, and his eighth amendment right to be free from cruel and unusual punishment.

## VI. REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests:

a. Actual damages in an amount to be proven at trial;

b. Punitive damages against individual Defendants;

c. Pre- and post-judgment interest as allowed by law;

d. Attorneys' fees and costs under 42 U.S.C. § 1988;

e. Such other relief as the Court deems just and proper.

## VII. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

Law Office of Jonathan Vernon, PLLC

By: /s/: Jonathan Vernon

Jonathan Vernon
Attorney-in-Charge
Texas Bar No. 24075219
Southern District of Texas Bar No. 3923151
Email: jonathan@jvernonlaw.com
681 Park Street
Beaumont, TX 77701
Tel. (409) 727-4847

Fax. (409) 727-4867
Attorney for Plaintiff Jeryco Kent Chizer

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| JERYCO KENT CHIZER,<br>Plaintiff, | ) | |
| v. | ) | CIVIL ACTION NO. 3:25-cv-314 |
| CITY OF GALVESTON, TEXAS,<br>GALVESTON COUNTY, TEXAS, et al. | ) | |
| Defendants. | ) | |

**PLAINTIFF'S SECOND AMENDED COMPLAINT AND REQUEST FOR JURY TRIAL**

TO THE HONORABLE UNITED STATES DISTRICT COURT:

COMES NOW Plaintiff Jeryco Chizer by and through his undersigned counsel, complaining of Defendants, and respectfully alleges as follows:

## I. INTRODUCTION

1. This is a civil rights action brought pursuant to 42 U.S.C. § 1983 for violations of Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution.

2. Plaintiff was subjected to unlawful detention, unlawful arrest, and multiple instances of excessive force without justification. Plaintiff was beaten, tased repeatedly, and denied necessary medical care. Following this abuse, Plaintiff was released from custody with no valid charges, despite internal indications that material facts in the associated police reports were fabricated.

3. Plaintiff seeks actual and punitive damages, attorneys' fees, costs, and all other relief to which he is justly entitled.

## II. JURISDICTION AND VENUE

4. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 1343(a)(3), as this action arises under the Constitution and laws of the United States.

5. Venue is proper under 28 U.S.C. § 1391(b), as all events giving rise to the claims occurred in Galveston County, Texas.

## III. PARTIES

6. Plaintiff JERYCO CHIZER is an individual residing in the State of Texas. At all times relevant to the allegations of this complaint was a resident of Hardin County and a citizen of the United States.

7. Defendant CITY OF GALVESTON is and was at all relevant times a municipal corporation and may be served through its City Attorney or Mayor.

8. Defendant GALVESTON COUNTY is and was at all relevant times a governmental entity and may be served through the County Judge or County Attorney.

9. Defendant Andy J. "A.J." Kessler was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

10. Defendant Andrew Mejia was at all relevant times employed by Galveston

County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

11. Defendant Gabriel Garza was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

12. Defendant Marc M. Healy (also known or referred to as "Mark" Healy) was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

13. Defendant Lee E. Prevost was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

14. Defendant Rylan J. Watkins/R. Watkins was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

15. Defendant Henry Trochesset was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the

agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

16. Defendant Jordan Buckley was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

17. Defendant Travis L. Hall was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

18. Defendant Ronald K. Paulk was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

19. Defendant Thomas Maffei was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

20. Defendant Mitchell Stephenson was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued

individually and in his official capacity.

21. Defendant Jeffrey Page was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

~~22. Defendant Audreya Tidwell was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times she was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. She is sued individually and in her official capacity.~~

~~23. Defendant Tammy Padron was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times she was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. She is sued individually and in her official capacity.~~

~~24.~~22. Defendant Kenneth Dunn was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

~~25.~~23. Defendant Paul Bohn was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

~~26.~~24. Defendant Pablo Cintron was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

~~27.~~25. Defendant Benjamin Moralez was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times he was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. He is sued individually and in his official capacity.

~~28. Defendant April Rodriguez was at all relevant times employed by Galveston County or the City of Galveston. At all relevant times she was acting in such capacity as the agent, servant, and employee of defendant Galveston County and or the City of Galveston. She is sued individually and in her official capacity.~~

~~29.~~26. Defendants JOHN DOES 1–10 are unknown individual officers and/or jail staff at all relevant times employed by the City of Galveston and/or Galveston County. These individuals participated in or failed to intervene in the unlawful acts described herein. Their names and identities will be added once discovery reveals them. At all relevant times they were acting in such capacity as the agent, servant, and employee of defendant(s) City of Galveston and/or Galveston County. They are sued individually and in his official capacity.

## IV. FACTUAL ALLEGATIONS

~~30.~~27. On or about November 5, 2023, Plaintiff and his spouse were returning to their lawful temporary residence near the beach in Galveston, Texas. They had been escorted through a blocked off area hours after a nearby shooting by a uniformed law enforcement officer.

~~31.~~28. The escorting officer left abruptly, and Plaintiff was immediately confronted by other law enforcement officers who began shouting commands. Despite calmly explaining the situation and agreeing to commands to leave the area, Plaintiff was forcibly taken to the ground by multiple officers, beaten, and tased repeatedly.

~~32.~~29. Plaintiff was not resisting, not aggressive, and made no threatening movements. He was subsequently handcuffed, compliant, and yet continued to be subjected to repeated tasing and physical abuse.

~~33.~~30. Officers dragged Plaintiff to a law enforcement staging area, where—once out of public view—he was again violently assaulted without provocation. This resulted in serious injuries, including a torn tricep and related ligaments and tissues, fractured leg, torn diaphragm, and other trauma.

~~34.~~31. Plaintiff identifies deputies Garza, Mejia, Buckley, Healy, Stephenson, Paulk, and supervisors Hall and Maffie as the deputies taking these actions.

~~35.~~32. One of the said officers can be heard making complaints about how Plaintiff presented himself in his dress and physical appearance through jeers and insults. Although Plaintiff was respectful and compliant, the officers did not like Plaintiff's expressive conduct, including speech and dress.

~~36.~~33. Upon arrival at the Galveston County Jail, Plaintiff displayed objective signs of significant injury consistent with recent force and restraint, including visible swelling and bruising to his upper extremities, an inability to raise or use his arm normally, and complaints of numbness and loss of sensation in the arm/hand. Plaintiff also exhibited an abnormal gait and visible limping consistent with serious lower-extremity injury, and he repeatedly advised jail personnel that he was in severe pain, that he could not move his arm, and that he needed medical attention. These were not subtle or ambiguous symptoms; they were outwardly apparent manifestations of acute trauma that any reasonable person, especially an intake officer, would recognize as requiring prompt evaluation and, at minimum, meaningful assessment beyond routine vitals.

~~37.~~34. Despite Plaintiff's repeated complaints and obvious limitations, jail staff provided only a cursory screening limited to taking basic vital signs (e.g., blood pressure and temperature) and did not conduct any meaningful assessment of Plaintiff's injuries, did not document or respond to his loss-of-function complaints, and did not arrange timely medical evaluation, imaging, or transport.

~~38.~~35. Instead, Plaintiff was left in custody for hours without care while his pain and functional impairment persisted, and then released with no assistance other than a belated instruction to "go to the hospital." By disregarding repeated requests and obvious signs of serious injury and failing to obtain appropriate evaluation or treatment, jail personnel acted with deliberate indifference to Plaintiff's serious medical needs, and the

Sheriff's Office's intake/medical practices were a moving force behind the resulting harm and exacerbation of injuries.

~~39.~~36. On information and belief, those present during Plaintiff's intake and denial of medical treatment were Defendants Kessler, Watkins, Prevost, Bohn, Moralez, Page, ~~Tidwell,~~ Citron~~, Rodriguez~~. Each was aware of the seriousness of Plaintiff's injuries. As stated, none took any actions to get Plaintiff the treatment he required or even took steps to examine Plaintiff's injuries to dispel what simple observation showed were serious injuries.

~~40.~~37. After his release from the jail, Plaintiff went directly to the hospital where he required emergency surgery.

~~41.~~38. During this time, Defendant Dunn was assigned to oversee the units in the jail where Plaintiff was held. Defendant Dunn failed to exercise any oversight of Plaintiff in deliberate indifference to Plaintiff's condition.

~~42. At all relevant times, Defendant Padron was partnered with Defendant Kessler, yet "does not recall" being present at any relevant times? Plaintiff believes otherwise. Pardon's inability to recall is telling.~~

~~43.~~39. Plaintiff was never charged with assaulting an officer or resisting arrest. Plaintiff was charged with the minor offense of public intoxication. After Plaintiff contested the case and requested a jury trial, the court dismissed the charge and noted the whole situation was strange and made no sense.

~~44.~~40. After requesting public records, Plaintiff discovered discrepancies between

official reports and available video evidence. At least one report appears to have been authored by an individual who, according to information provided by department officials, may not have been present at the time of the events in question.

~~45.~~41. Additional records exhibit inconsistencies and signs of possible retroactive alterations or fabrication. The identities of all officers involved have not been fully disclosed, and at least one known officer (but what seems to be most officers) failed to activate or preserve video footage.

~~46.~~42. Upon information and belief, the law enforcement officers who participated in the events giving rise to this action were employees, agents, or contractors of the Galveston Police Department and/or the Galveston County Sheriff's Office, and were acting under color of law and pursuant to policies, customs, or directives issued by one or both entities. Discovery will clarify the chain of command, specific agency involvement, and jurisdictional authority during the events at issue.

~~47.~~43. On information and belief, the abuse to which plaintiff was subjected was consistent with an institutionalized practice of the Galveston Police Department and/or Galveston Sherriff's Office, which was known to and ratified by the City of Galveston and the County of Galveston, the defendants having at no time taken any effective action to prevent law enforcement personnel from continuing to engage in such misconduct.

~~48.~~44. Upon information and belief, well before the incident at issue, Galveston County policymakers—including the Sheriff, Captain Hall, and Incident Commander Maffei—were on notice of a pattern of materially similar misconduct by deputies assigned to event-enforcement

details and custodial operations, including over-aggressive citizen encounters, excessive force and Taser misuse, failure to activate/preserve recordings, and inaccurate or incomplete reporting used to justify force and arrests. This notice arose through multiple channels routinely available to and maintained by the Sheriff's Office and the County, including citizen complaints submitted through official complaint mechanisms, internal supervisory reviews and after-action processes for recurring City events, incident and arrest documentation, civil claims and litigation notices, and publicly available reports and postings concerning deputy conduct. Despite that notice, County policymakers failed to implement corrective training, supervision, discipline, screening, or deployment restrictions for deputies placed into high-risk event and jail roles, and instead continued to assign and empower the same force-forward approach without meaningful accountability safeguards—thereby ratifying and perpetuating an unconstitutional custom. The County's own handling of this incident—delayed/incomplete identification of involved deputies, missing or incomplete recordings, and a belated, cursory paper record used to justify force—further supports the reasonable inference that these were not isolated failures but the predictable product of a tolerated pattern and practice.

49. 45. On information and belief, defendants the City of Galveston and/or the County of Galveston had prior notice of the vicious propensities of defendant law enforcement officers, but took no steps to train them, correct their abuse of authority, or to discourage their unlawful use of authority. The failure to properly train defendant law enforcement officers included the failure to instruct them in applicable provisions of the Texas State Penal Law and with proper and prudent use of force.

~~50.~~46. By allowing deputies to operate in the Event footprint and jail intake without enforced documentation, recording, and discipline, the City and County created an environment in which deputies could predictably use force and then justify it without consequence, directly causing the violations inflicted on Plaintiff.

~~51.~~47. As an additional reason to the above, and upon information and belief, Galveston County—through the Sheriff (Trochesset) as the final policymaker—either retained or delegated final authority for review and approval of use-of-force documentation and related offense reports arising from arrests and force incidents in general and especially at major public events and during jail intake. The Sheriff knew that accurate, timely, and substantive review of these reports is essential to preventing excessive force because such review governs training, discipline, deployment decisions, and whether unconstitutional force is corrected or instead normalized.

~~52.~~48. In this case, supervisory approval was claimed to be issued (including approval by Captain Hall) purporting to review and approve only a single deputy's use of force and the asserted basis for it, yet that "review" was perfunctory, relied on incomplete or missing recordings, and adopted false or reckless narratives used to justify the force and arrest.[1] The use of force report from deputy Garza is a simple form in which Garza fails to mention any other officers or other witnesses present (as is required) during his excessive use of force. Furthermore, the use of force review by Deputy Hall was perfunctory, literally ticking boxes, and explicitly ratified the use of force and stated it was within policy

[1] Though the timing of the County's delivery of the report and the date of the report itself are suspicious indicating that the report was not part of the County's normal procedures, but done after the fact to paper over the institutional lack of oversight.

guidelines and followed training and tactics. Therefore, Plaintiff's treatment is the official policy of the Galveston County Sherrif's Office.

~~53.~~49. By delegating review authority to subordinates without meaningful standards, audit, or consequence on the most important matters in law enforcement knowing the effects of such—or by acquiescing in rubber-stamp approvals that papered over misconduct—the Sheriff and County policymakers ratified the decision to use force and the unconstitutional basis offered to justify it, thereby establishing a County policy/custom that was a moving force behind the constitutional violations in this case.

~~54.~~50. Upon information and belief, the Sheriff's Office's systemic failures to require recording, preserve evidence, and conduct meaningful post-incident review—combined with the tolerance of inaccurate or conclusory reporting and rubber-stamp supervisory approvals—operate as an institutional "permission structure" for unconstitutional force. When deputies know that body-worn cameras may be off, key footage will not be retained, reports can be papered over after the fact, and supervisors will approve force without examining a complete record, the predictable and highly foreseeable result is that deputies use more force, more readily, and more unlawfully because the likelihood of consequences is effectively removed. In other words, the County's non-recording/non-preservation and perfunctory review practices are not merely after-the-fact procedural defects; they are a direct causal driver that encourages and normalizes excessive force and false justification. That system was a moving force behind the constitutional violations here because it enabled deputies to act aggressively in the Event footprint and

during jail intake with the reasonable expectation that incomplete evidence, inaccurate narratives, and minimal oversight would shield them from accountability.

~~55.~~51. On information and belief, defendants the City of Galveston and/or the County of Galveston authorized, tolerated as institutionalized practices, and ratified the misconduct herein detailed by:

a. Failing to properly discipline, restrict, and control employees, including defendant law enforcement officers, known to be irresponsible in their dealings with citizens of the community;

b. Failing to take adequate precautions in the hiring, promotion, and retention of police personnel, including specifically defendant law enforcement officers;

c. Failing to forward to the office of the District Attorney of Galveston County evidence of criminal acts committed by police personnel;

d. Failing to establish and/or assure the functioning of a *bona fide* and meaningful departmental system for dealing with complaints of police misconduct, but instead responding to such complaints with bureaucratic power and official denials calculated to mislead the public. This conduct also constitutes gross negligence under state law.

~~56.~~52. As a consequence of the abuse of authority detailed above, plaintiff sustained the damages hereinbefore alleged.

~~57.~~53. Galveston County, acting through the Sheriff (Trochesset) as its final policymaker for law-enforcement and jail operations, maintained and enforced policies, customs, and practices that amounted to deliberate indifference to the constitutional rights of citizens, and those policies/customs were the moving force behind the violations suffered by Plaintiff.

~~58.~~54. Upon information and belief, the County deployed and empowered deputies to police the Event and its surrounding "crime scene" footprint under an aggressive, force-forward enforcement posture, while failing to adopt and implement adequate training, supervision, and controls concerning (i) lawful citizen encounters and scene management (including interacting with non-suspect patrons lawfully present and seeking to leave), (ii) constitutional limits on use of force and Taser deployments (including use of force on compliant or subdued persons), (iii) detainee medical screening, access to care, and transport for injured arrestees, and (iv) required activation, retention, review, and audit of body-worn camera footage, Taser logs, reports, and complaint intake for use-of-force incidents. The need for training/supervision and meaningful reporting/video-retention safeguards in these high-risk areas was obvious, and the inadequacy was so likely to result in constitutional violations that County policymakers—including the Sheriff and supervisors such as Captain Hall and Incident Commander Maffei vested with final authority by the Sheriff—can reasonably be said to have been deliberately indifferent; despite notice of recurring aggression and unconstitutional force risks by deputies (including deputies known for violent or vicious propensities), the County nonetheless assigned, promoted, and authorized such deputies to work the Event and jail intake without effective oversight, discipline, or remedial training.

~~59.~~55. Further, after the incident, County policymakers had an opportunity to review the deputies' actions and the basis for them and—through inaction, acquiescence, and ratification—approved or tolerated the conduct rather than imposing consequences or correcting the operational plan, thereby permitting deputies to operate under an unwritten custom of "no accountability." As a direct and proximate result, Plaintiff was subjected to unreasonable seizure and excessive force at the Event and then deliberate indifference to his serious medical needs during booking and detention, all in violation of clearly established constitutional law.

~~60.~~56. Upon information and belief, Galveston County, acting through the Sheriff (Trochesset) as final policymaker and other policymakers, maintained and tolerated a policy, custom, and practice of minimizing, concealing, and avoiding accountability for unconstitutional uses of force by (a) failing to require deputies to activate body-worn cameras and to create complete use-of-force documentation, (b) permitting deputies and supervisors to treat video recording as optional in high-risk encounters, (c) failing to preserve and/or timely retrieve relevant recordings and data (including bodycam footage, jail intake/sally-port surveillance, and Taser logs/downloads), and (d) maintaining deficient complaint-intake and internal-review procedures that predictably result in missing evidence and "no consequences" outcomes.

~~61.~~57. This policy continues and can be seen even in litigation by Galveston County's general counsel's admissions that they only ever review documents—and do not even document cases such as Plaintiff's for claimed (albeit false) violations at issue or at such events or for claimed assaults or uses of force and do not maintain any body cam videos or official reports or dispatch logs to know who was on scene/call in such matters—which is absurd. County counsel

even admitted they do not have a system of "inquisition" … or any other verifiable method to find information—even to simply ask employees and law enforcement personnel basic questions.

~~62.~~58. This custom—whether by affirmative instruction, acquiescence, or deliberate non-enforcement—functioned as a de facto cover-up mechanism designed and intended to shield deputies and the County from scrutiny, discipline, and civil liability, and it was known to County policymakers (including the Sheriff) and approved through repeated tolerance and inaction. Such concealment and non-preservation practices reflect deliberate indifference because the need for strict recording, retention, and audit controls in use-of-force incidents is obvious, and the predictable consequence of allowing deputies to avoid filming and documentation is and results in further constitutional violations. In this case, consistent with that policy/custom, critical recordings and documentation of the encounter, transport, and detention were not captured, not preserved, and/or not produced, thereby enabling the underlying excessive-force and deliberate-indifference violations and impeding any meaningful contemporaneous review, correction, or discipline.

~~63.~~59. Upon information and belief, the City of Galveston, acting through its final policymakers and/or those vested with final decision-making authority over event operations and public safety, planned, authorized, and implemented the Event and the related public-safety/security operations within the Event footprint (including ingress/egress routes and adjacent "crime scene" areas) through a coordinated operational plan and agreement and unified

command structure with other agencies, including Galveston County deputies that include defendants named herein, to provide crowd control and law-enforcement services.

~~64.~~60. In doing so, the City knowingly assumed and/or delegated operational authority for policing within the Event footprint to participating officers and deputies, yet failed to implement and enforce adequate supervision and accountability measures—such as mandatory body-worn camera activation, retention and audit of recordings and Taser data, standardized use-of-force reporting, complaint intake, and meaningful incident review—despite the obvious and foreseeable risk that aggressive enforcement in a dense nightlife/event setting would lead to unconstitutional seizures and excessive force against non-threatening, lawfully present patrons attempting to travel and leave the area.

~~65.~~61. The City's policies, customs, and practices of (a) approving the operational plan without constitutional safeguards, (b) acquiescing in a coordinated interagency approach that functionally operated as "police without accountability," and (c) failing to discipline, retrain, or correct known deficiencies, constituted deliberate indifference to constitutional rights and were a moving force behind the violations inflicted on Plaintiffs. Further, to the extent County personnel acted in the Event footprint pursuant to City-authorized event operations, those actions were taken under color of and in furtherance of the City's coordinated plan, making the City responsible for its own policy decisions and operational failures that caused the deprivation of Plaintiffs' rights.

~~66.~~62. While the precise form of the interagency arrangement is uniquely within Defendants' possession and will be confirmed in discovery, the City necessarily exercised

authority through special-event permits, operations planning, staffing/over-time approvals, command presence, and/or direction of the geographic footprint and enforcement objectives. The City either assumed operational responsibility for policing in the Event footprint or knowingly delegated substantial operational authority to County personnel while remaining responsible for the policy choices it made in structuring that plan, including the deliberate choice to implement a high-risk, force-forward enforcement posture in a dense nightlife/event setting without adequate constitutional safeguards for lawfully present patrons attempting to travel, exit, or reach lodging.

~~67.~~63. Further, upon information and belief, the City maintained and tolerated policies, customs, and practices that deprived citizens of constitutional protections and meaningful post-incident review by failing to require and enforce basic accountability measures during Event operations—such as mandatory activation of body-worn cameras, preservation of available recordings and communications, maintenance of dispatch/CAD logs and incident identifiers sufficient to identify all involved personnel, and timely creation and retention of complete incident and use-of-force documentation for serious arrests and force events occurring within the City-authorized Event footprint.

~~68.~~64. Consistent with these deficient City practices, the available recordings and documentation relating to Plaintiffs' encounter were incomplete and/or not preserved, and Plaintiff was denied timely access to basic identifying and incident information; this lack of recording, retention, and meaningful review was not accidental but the predictable product of policies and customs that make excessive force and unlawful detention more likely by allowing

officers and deputies operating in the Event footprint to act without real oversight or consequence. These City policy decisions and operational failures constituted deliberate indifference and were a moving force behind the constitutional violations inflicted on Plaintiffs.

~~69.~~65. The City's own failure to require recording, retention, identification, and meaningful review for serious force incidents occurring within the City-authorized Event footprint mirrored and reinforced the County's non-accountability system, making unconstitutional force a highly predictable consequence of the City's event-operations choices. And the way these approvals and joint operations get done--the city had to know.

~~70.~~66. As detailed herein, after Plaintiff was transported to the Galveston County Jail—an institution operated by and under the Sheriff (Trochesset) as final policy maker and other policymaking authority of the Galveston County Sheriff—jail personnel from transport through main intake and holding acted with deliberate indifference to Plaintiff's serious medical needs and furthered a cover-up of the unconstitutional force used against him. Plaintiff arrived visibly injured and repeatedly advised jail staff that he was hurt and needed medical attention; nonetheless, intake and holding personnel refused to secure timely medical screening, evaluation, or transport, mocked and threatened Plaintiff, and left him in a holding cell for hours without care while his condition worsened. Jail staff also seized Plaintiff's property, prevented or unreasonably delayed his access to his phone, and thereby his wife while she was stranded, and then released him without assistance other than a belated admonition to "go to the hospital," creating an unreasonable risk of further harm and exacerbating his injuries.

~~71.~~67. Compounding this indifference, Defendant A.J. Kessler—who functioned as the principal intake officer on duty and authored the offense report—falsely or recklessly reported that he personally observed Plaintiff's purported intoxication, belligerence, and assaultive conduct and that such conduct justified the seizure and force, even though Kessler did not witness the initial encounter and lacked a good-faith basis to claim personal observation of the alleged conduct; this false narrative was used to justify the arrest, support criminal charges, and insulate deputies and the County from accountability.

~~72.~~68. The Sheriff's Office and jail supervisors, such as Sergeant Dunn, knew, or should have known, that these practices—refusing care after obvious injury, denying access to outside help, and papering over force with inaccurate reports—created a highly predictable risk of constitutional violations, yet maintained, tolerated, and failed to correct these customs and practices, making them a moving force behind Plaintiff's unlawful detention, denial of medical care, and continued constitutional injury.

~~73.~~69. To further compound the foregoing, and upon information and belief, the Galveston County Sheriff (Trochesset as policy maker), County Sheriff's Office and County policymakers maintained and tolerated a system of avoidance and non-accountability designed to insulate deputies from scrutiny after uses of force—particularly at high-volume public events—by permitting incomplete or nonexistent body-worn camera recording, failing to require full and timely use-of-force documentation from all involved deputies, and allowing after-the-fact "papering" of incidents through cursory reports and perfunctory supervisory approvals such

that no one, including the Sheriff, examines the basis for any force used or any of the circumstances in a use of force situation.

~~74.~~70. In this case, despite repeated public-records requests and multiple appeals, Plaintiff was denied timely access to basic identifying and incident information (including which deputies were involved and what force was used), and only later received additional reports and materials that had not been produced previously; even then, the documentation produced was inconsistent, incomplete, and lacking critical detail. Although deputies believed to have been involved at initial stages of this incident /these incidents include Andrew Mejia, Gabriel Garza, Mark Healy, Jordan Buckley, Ronald K. Paulk, and Mitchell Stephenson, none produced complete contemporaneous bodycam footage, and the single video produced was incomplete and omitted critical portions of the initial encounter.

~~75.~~71. Likewise, only one deputy produced a use-of-force report, despite the County's own narrative admitting multiple uses of force by multiple deputies. That use of force report was cursory and failed to explain or justify the force with particularity, and any purported supervisory "review" (including approval attributed to Captain Hall) relied on and echoed the same false or reckless narrative advanced in Kessler's offense report—without meaningful review of video, without an evidentiary record, and without corrective action. This pattern of tolerated non-recording, non-preservation, delayed/incomplete production, and rubber-stamp review constitutes a County policy/custom of deliberate indifference that encourages excessive force and false reporting by making constitutional violations effectively consequence-free, and it was a moving force behind the violations inflicted on Plaintiff here.

V. CAUSES OF ACTION

~~76.~~72. The allegations set forth above are incorporated herein by reference.

~~77.~~73. The hereinabove described actions and omissions, engaged in under color of state authority by the defendants, including defendants County and City, which are responsible because of their authorization, condonation, and ratification thereof for the acts of their agents, deprived the plaintiff of rights secured to him by the Constitution of the United States, including, but not limited to, his first amendment right to freedom of expression, his fourth amendment right to be free from unlawful seizure of his person, fourteenth amendment rights to due process of law, including the right to be free from unjustified and excessive force utilized by police, and his fourteenth amendment right to medical care.

VI. REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests:

1. Actual damages in an amount to be proven at trial;

2. Punitive damages against individual Defendants;

3. Pre- and post-judgment interest as allowed by law;

4. Attorneys' fees and costs under 42 U.S.C. § 1988;

5. Such other relief as the Court deems just and proper.

VII. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

Law Office of Jonathan Vernon, PLLC

By: /s/: Jonathan Vernon
Jonathan Vernon
Attorney-in-Charge Texas Bar No. 24075219
Southern District of Texas Bar No. 3923151
Email: jonathan@jvernonlaw.com
681 Park Street
Beaumont, TX 77701
Tel. (409) 727-4847
Fax. (409) 727-4867
Attorney for Plaintiff Jeryco Kent Chizer

## CERTIFICATE OF SERVICE ON PARTIES

I certify that a true and correct copy of Plaintiff's Second Amended Complaint was sent via the Pacer system to the attorneys of record for all the parties in this action.

Dated: 7/24/26

/s/: Jonathan Vernon
Jonathan Vernon
Attorney for Plaintiff
Jeryco Kent Chizer